**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ZILYEN, INC.,

Plaintiff,

v.

RUBBER MANUFACTURERS ASSOCIATION,

Defendant.

Civil Action No. 12-0433 (RBW)

**MEMORANDUM OPINION**

This case arises from a dispute concerning a contract between the parties for the production of Compact Discs ("CDs") by the plaintiff, ZilYen, Inc., for the defendant, the Rubber Manufacturers Association ("the defendant" or "the Association"). First Amended Complaint ("Am. Compl.") ¶ 6; Rubber Manufacturers Association's Counterclaim ("Countercl.") ¶¶ 6–7. The plaintiff asserts claims against the defendant for breach of contract and for copyright infringement pursuant to 17 U.S.C. § 501 (2006). Am. Compl. ¶¶ 38–55. The defendant responds by asserting counterclaims for common law breach of contract, breach of warranty of merchantability, breach of warranty of fitness for particular purpose, and breach of contract pursuant to the District of Columbia Uniform Commercial Code, D.C. Code § 28-2-601 (2013). Countercl. ¶¶ 31–60. The parties' cross-motions to dismiss are now before the Court. See generally Further Motion to Dismiss Statutory Copyright Infringement Claim ("Def.'s Mot."); Plaintiff ZilYen, Inc.'s Rule 12(b)(6) Motion to Dismiss Rubber Manufacturers Association's Counterclaims I-IV ("Pl.'s Mot."). After carefully considering the parties'

submissions,[1] the Court concludes that it must grant the defendant's motion to dismiss, dismiss sua sponte the remaining claims over which it has only supplemental jurisdiction, and deny the plaintiff's motion to dismiss as moot.

## I. BACKGROUND

The following facts are taken from the plaintiff's amended complaint unless otherwise noted, and are accepted as true as required by Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] The parties, two corporations whose principal place of business is in the District of Columbia, Am. Compl. ¶ 1; Countercl. ¶ 1, entered into a contract under which the plaintiff "would design, produce, and deliver" 200,000 CDs to the defendant "for distribution among its members," Am. Compl. ¶ 6. The CDs were to contain content supplied by the defendant. See id. ¶¶ 12–13. The contract provided that the defendant would tender a payment of fifty percent of the estimated cost of the CDs upon execution of the contract, with the remaining balance "due upon delivery." Id. ¶¶ 9–10; Am. Compl. Exhibit ("Ex.") A at 2.[3] The agreement also included the following indemnification provision: "[The Association] recognizes that ZilYen cannot be held responsible for the accuracy of the information supplied to it by the [Association]—or the accuracy of the information included in material prepared by ZilYen and approved by the [Association]." Am. Compl. ¶ 12; Am. Compl. Ex. A at 2. Upon execution of the contract, the

[1] In addition to the documents already referenced, the Court considered the following filings in reaching its decision: (1) ZilYen, Inc.'s Opposition to Rubber Manufacturers Association's Motion to Dismiss ZilYen, Inc.'s Copyright Infringement Count ("Pl.'s Opp'n"); (2) Rubber Manufacturers Association's Reply to ZilYen, Inc.'s Opposition to Motion to Dismiss Statutory Copyright Infringement Count ("Def.'s Reply"); (3) the Memorandum in Support of Plaintiff ZilYen, Inc.'s Rule 12(b)(6) Motion to Dismiss Rubber Manufacturers Association's Counterclaims I–IV; (4) Rubber Manufacturers Association's Opposition and Memorandum of Points and Authorities in Opposition to ZilYen, Inc.'s Rule 12(b)(6) Motion to Dismiss Counterclaim; and (5) the Reply Memorandum in Support of Plaintiff ZilYen, Inc.'s Rule 12(b)(6) Motion to Dismiss Rubber Manufacturers Association's Counterclaims I–IV.

[2] Because the Court is deciding only the defendant's motion to dismiss and does not reach the plaintiff's motion for reasons to be discussed shortly, the facts set forth in this section of the opinion reflect only the plaintiff's allegations, which are accepted as true for the purpose of deciding the defendant's motion.

[3] Citations to the plaintiff's exhibits utilize the page numbers assigned by the Court's electronic filing system.

defendant paid the plaintiff fifty percent of the estimated cost of the CDs. See Am. Compl. Ex. A at 4 (acknowledging previous receipt of $53,450.00).

The plaintiff repeatedly consulted the defendant about the CDs' content and software during the production stage. Am. Compl. ¶¶ 14, 15, 20. On September 20, 2011, the plaintiff provided a final draft CD for the defendant to review before production of the copies. Id. ¶ 20. A representative of the defendant approved the final draft CD by email that same day. Id. ¶ 21. Upon receipt of the defendant's approval of the final draft CD, the plaintiff submitted a master copy of the approved CD to a printer to produce the copies. Id. ¶ 22.

On September 27, 2011, the plaintiff provided the defendant with an amended contract that increased the number of CDs to be produced and included additional packaging for the CDs, both modifications made at the defendant's request. Id. ¶¶ 7–8. The amended contract included final costs for the production and packaging of the CDs and indicated that a signature on behalf of the defendant was needed to approve "payment as COD." Id. ¶ 11; Am. Compl. Ex. A at 4. The amended agreement also contained a new provision which had not been included in the original contract, which stated:

> Every effort will be made on the part of ZilYen to proofread documents and test functional components prior to printing/production and distribution. Final responsibility for proofreading and approval of drafts, artwork and CD function are entirely the [Association's] responsibility. Prior to document printing and distribution, [the Association] shall sign all proofs/drafts.

Am. Compl. ¶ 13; Am. Compl. Ex. A at 4. On September 28, 2011, a representative of the defendant signed the amended contract. Am. Compl. ¶ 8; see Am. Compl. Ex. A at 5.

On September 28, the defendant received four hundred copies of the CD, with the remainder of the copies shipped to a delivery agent, pursuant to the defendant's request. Am. Compl. ¶¶ 26, 28. Upon receipt of the CDs, employees of the defendant "ran the CD software on their computers," which "require[d] a copy to be made on the random access memory . . . of the

user's computer in order to properly run the application." Id. ¶ 54. That same day, the defendant contacted the plaintiff "alleging that the CDs as delivered contained an error in the link to the Adobe Reader X software on the CD." Id. ¶ 31. The CDs functioned properly in all other respects. Id. ¶ 32. The defendant did not pay the remaining balance of the contract amount upon delivery of the CDs, and the balance remains outstanding. Id. ¶¶ 29, 30, 37.

The plaintiff brought suit alleging breach of contract and copyright infringement. Id. ¶¶ 38–55. The plaintiff invokes this Court's jurisdiction over the copyright infringement claim pursuant to 28 U.S.C. § 1338, and over the breach of contract claim pursuant to 28 U.S.C. § 1367. Id. ¶ 3. The defendant has filed counterclaims for common law breach of contract, breach of warranty of merchantability, breach of warranty of fitness for particular purpose, and breach of contract under the District of Columbia Uniform Commercial Code. Countercl. ¶¶ 31–60. The defendant asserts that the Court has jurisdiction over its counterclaims because its claims "arise out of the same transaction and occurrence that is the subject matter of Plaintiff's claims." Id. ¶ 3. After filing suit, the plaintiff registered a copyright for the CD software. Am. Compl. ¶ 36.

The defendant has now filed a motion to dismiss the plaintiff's copyright infringement claim. Def.'s Mot. at 1. The plaintiff thereafter filed a motion to dismiss all of the defendant's counterclaims. Pl.'s Mot. at 1.

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests whether the complaint "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In making this assessment, a

plaintiff receives the "benefit of all inferences that can be derived from the facts alleged," Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks and citation omitted), and the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice," EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997) (footnote omitted). But raising a "sheer possibility that a defendant has acted unlawfully" fails to satisfy the facial plausibility requirement. Iqbal, 556 U.S. at 678. Rather, a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). While the Court must accept the plaintiff's factual allegations as true, any conclusory allegations are not entitled to an assumption of truth, and even those allegations pleaded with factual support need only be accepted to the extent that "they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679. A defendant may raise an affirmative defense in a motion under Rule 12(b)(6) "when the facts that give rise to the defense are clear from the face of the complaint." Smith-Haynie v. Dist. of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998). And dismissal of a plaintiff's claims based on the assertion of an affirmative defense is proper under Rule 12(b)(6). See, e.g., Kursar v. Transp. Sec. Admin., 442 F. App'x, 565, 567 (D.C. Cir. 2011) (upholding dismissal under Rule 12(b)(6) based on affirmative defense of statute of limitations because "the complaint on its face is conclusively time-barred") (citation omitted); Burroughs Payment Sys., Inc. v. Symco Grp., Inc., No. C-11-06268, 2012 WL 1670163, at * 6 (N.D. Cal. May 14, 2012) (finding that a court may consider the affirmative defense of § 117(a) on a motion to dismiss when the facts alleged in the complaint give rise to the affirmative defense); see also Summit Tech., Inc. v. High-Line Med. Instruments Co., 922 F.

Supp. 299, 315–16 (C.D. Cal. 1996) (dismissing copyright infringement claim on motion under Rule 12(b)(6) based on § 117(a) defense apparent from facts alleged in complaint).

## III. ANALYSIS

### A. Copyright infringement

In order to establish a prima facie claim of copyright infringement under 17 U.S.C. § 501, a plaintiff must demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Pubs., Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991). The plaintiff's claim of copyright infringement is based on the use of the CDs by the defendant's employees after their delivery to the Association's offices on September 28, 2011 and thereafter when the employees "ran additional tests of the CDs." Am. Compl. ¶¶ 54–55. Because "[e]xecuting application software requires a copy to be made on the random access memory . . . of the user's computer in order to properly run the application," the defendant's employees created "an unlicensed copy" of the CD software when they ran the CD on the defendant's computers on September 28 and thereafter. Am. Compl. ¶ 54. The defendant does not contest the validity of the plaintiff's copyright or that use of the CDs by its employees constitutes a "copying" of original elements of the work within the meaning of § 501, see generally Def.'s Mot., but argues that its actions nonetheless do not constitute an infringement because (1) "the 'copying' done by [the defendant] was an 'essential step' in the utilization of the computer program" and therefore the affirmative defense created by § 117 of the Copyright Act applies; (2) the defendant has "an implied license . . . to inspect and test run the CDs on [the defendant's] computers" upon delivery; and (3) the CDs constitute the "joint work" of the parties and therefore the defendant is a joint owner of the software copyright, Def.'s Mot. at 2.

**1. Affirmative defense under § 117(a)**

The relevant provision of § 117 provides that "it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided: (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner . . . ." 17 U.S.C. § 117(a)(1) (2006). Thus, in order to invoke the affirmative defense provided by § 117(a)(1), the defendant must show that the copy of the CD software "(i) was made by the 'owner of a copy of [the] computer program'; (ii) was 'created as an essential step in the utilization of the computer program in conjunction with a machine'; and (iii) was 'used in no other manner.'" Krause v. Titleserv, Inc., 402 F.3d 119, 122 (2d Cir. 2005).

The Copyright Act distinguishes between ownership of a copyright and ownership of a copy of a copyrighted work, 17 U.S.C. § 202 (2006), but does not define the term "owner" as used in § 117(a)(1). The legislative history of § 117 does not provide much assistance in determining Congress' meaning either. Section 117 was enacted upon the recommendation of the National Commission on New Technological Uses of Copyrighted Works ("Commission"). H.R. Rep. No. 96-1307(I) at 23 (1980), reprinted in 1980 U.S.C.C.A.N. 6460, 6482. The Commission explained that it proposed the addition of § 117 because "the law should provide that persons in rightful possession of copies of programs be able to use them freely without fear of exposure to copyright liability." Final Report of the National Commission on New Technological Uses of Copyrighted Works 13 (1979). Congress made only one alteration to the Commission's proposed language for § 117, substituting the language "owner of a copy of a computer program" in place of "rightful possessor of a computer program," as suggested by the Commission. See id. at 12. The legislative history contains no explanation as to why this change was made.

This Circuit has not had occasion to consider this provision of the Copyright Act. The Second Circuit and the Federal Circuit, however, have both rejected the notion that possession of formal title to a copyrighted program is necessary in order to be considered an "owner" under § 117(a)(1), looking instead to the circumstances of the transaction at issue to determine whether the software user exercised rights consistent with ownership.[4] Krause, 402 F.3d at 123–24; see DSC Commc'ns Corp. v. Pulse Commc'ns, 170 F.3d 1354, 1360–62 (Fed. Cir. 1999); cf. Vernor v. Autodesk, Inc., 621 F.3d 1102, 1111 (9th Cir. 2010) (establishing a test for determining whether a possessor of a computer program is a licensee, and thus not an "owner" under § 117(a), by looking to the terms of the parties' agreement for use and possession of the program). But see Synergistic Techs., Inc. v. IDB Commc'ns, Inc., 871 F. Supp. 24, 29 (D.D.C. 1994) (holding that the defendant was an "owner" within the meaning of § 117(a)(1) based on transfer of title provisions of the District of Columbia Uniform Commercial Code).

In DSC Communications, the Federal Circuit determined the issue of ownership by looking to the agreement governing the use of the software. 170 F.3d at 1360–61. After determining that the agreement provided for formal title to remain with the copyright owner, the court went on to consider whether the restrictions on the software's use imposed on the user by the agreement were consistent with the rights of "owners of copies of software." Id. at 1361–62. In its analysis, the court noted that "[t]he concept of ownership of a copy entails a variety of

[4] At least one district court has suggested that DSC Communications adopted a formal title test and therefore that Krause and DSC Communications represent opposing views of ownership under § 117(a). See Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp., 387 F. Supp. 2d 521, 538 n.12 (M.D.N.C. 2005). As explained in the discussion below, however, the Federal Circuit did not limit its analysis to the possession of formal title. See DSC Commc'ns, 170 F.3d at 1361–62. Accordingly, this Court views the two decisions as embracing the same approach to determining ownership under § 117. See Softech Worldwide, LLC v. Internet Tech. Broad. Corp., 761 F. Supp. 2d 367, 373 n.2 (E.D. Va. 2011) (disagreeing with the characterization of Krause and DSC Communications as a "circuit split" between the Second and Federal Circuits on this issue); see also Krause, 402 F.3d at 123 (describing the approach of DSC Communications as "looking rather at the various incidents of ownership" and "attach[ing] less importance to formal title").

rights and interests," and rejected the idea that any one factor, such as the right to perpetual possession or the user's payment of a single fee, is dispositive in this analysis. See id. at 1362.

In Krause, the Second Circuit held that "courts should inquire into whether the party exercises sufficient incidents of ownership over a copy of the program to be sensibly considered the owner of the copy for purposes of § 117(a)" and considered the circumstances of the parties' relationship and the use of the software in order to determine whether the possessor of the computer program could be considered an "owner" under § 117(a). 402 F.3d at 124. In adopting this approach to determining ownership under § 117(a), the Second Circuit reviewed the legislative history of the provision and rejected the argument that Congress evinced an intention to limit the protection of § 117 to those holding formal title with its substitution of "owner" for "rightful possessor" because "Congress easily could have intended to reject so broad a category of beneficiaries without intending a narrow, formalistic definition of ownership dependent on title," noting that the term "rightful possessor" would encompass "a messenger delivering a program, a bailee, or countless others temporarily in lawful possession of a copy." Krause, 402 F.3d at 123. The court opined that restricting the availability of the defense to those holding formal title would "undermine some of the uniformity achieved by the Copyright Act," an "express objective" of the Act, because possession of formal title is generally a question of state law, which would result in inconsistent application of § 117. Id. Finally, the Second Circuit reasoned that "it seems anomalous for a user whose degree of ownership of a copy is so complete that he may lawfully use it and keep it forever, or if so disposed, throw it in the trash, to be nonetheless unauthorized to fix it when it develops a bug, or to make an archival copy as backup security." Id.

This Court finds the Second Circuit's reasoning persuasive. While the Court acknowledges that Congress' substitution of the term "owner" for "rightful possessor" indicates

an intent to limit the pool of software users that may claim the protection of § 117(a), see DSC Commc'ns, 170 F.3d at 1360, the Court agrees, based on the other considerations outlined in Krause, that Congress did not intend to limit § 117(a) to those holding formal title of computer programs. Accordingly, the Court will assess whether the defendant exercised sufficient incidents of ownership over the CD software such that the defendant could be deemed an "owner" within the meaning of § 117(a).[5]

The facts in Krause, while not directly analogous to the facts at issue here, are instructive. Krause involved a dispute between the defendant, Titleserv, Inc., and the plaintiff, a computer programmer who wrote over thirty-five computer programs for Titleserv. 402 F.3d at 120. When Krause terminated his relationship with Titleserv, he left the programs on the servers but locked them to prevent their use by Titleserv. Id. at 120–21. Titleserv's employees were able to circumvent the locks and Titleserv continued to use and modify the programs. Id. at 121. The Court based its determination that Titleserv was an "owner" of the program under § 117(a) based on the following factors, which it found to be indicators of ownership:

> Titleserv paid Krause substantial consideration to develop the programs for its sole benefit. Krause customized the software to serve Titleserv's operations. The copies were stored on a server owned by Titleserv. Krause never reserved the right to repossess the copies used by Titleserv and agreed that Titleserv had the right to continue to possess and use the programs forever, regardless whether its relationship with Krause terminated. Titleserv was similarly free to discard or destroy the copies any time it wished.

Id. at 124.

[5] The Court notes that it does not interpret Krause as espousing a five-factor test for ownership under § 117(a), as at least one court has suggested. See Stuart Weitzman, LLC v. MicroComputer Res., Inc., 510 F. Supp. 2d 1098, 1107–09 (S.D. Fla. 2007), vacated on other grounds, 542 F.3d 859 (11th Cir. 2008). The Second Circuit did not suggest that the relevant factors indicating that a possessor "exercises sufficient incidents of ownership" were limited to the five factors it identified as weighing in favor of ownership in the case before the court; in fact, the court indicated that "presence or absence of formal title may of course be a factor in this inquiry," although it did not consider that factor in its analysis. Krause, 402 F.3d at 124. This Court will therefore look generally to the circumstances surrounding the transaction at issue, which will necessarily implicate most of the factors discussed in Krause.

Here, the facts alleged in the plaintiff's amended complaint establish that the defendant is an "owner" entitled to claim the defense provided by § 117(a). Under the heading "Scope of Work to Be Performed," the contract between the parties provided that the plaintiff "will work collaboratively with [the defendant] to create, print and deliver [Rubber Manufacturers Association] CD Center CDs and packaging." Am. Compl. Ex. A at 2, 4. The plaintiff's employees designed the CD software, which allowed users to access and navigate the content provided by the defendant, pursuant to the agreement between the parties and in consultation with the defendant. Am. Compl. ¶¶ 14–19. And the plaintiff revised the software at the defendant's request. Id. ¶ 16. Although the plaintiff claims that "[a]ccording to the contract between the parties, [the defendant's] use of the CDs was for distribution to its members," Pl.'s Opp'n at 8, the Court finds no language in the agreement restricting the defendant's use of the CDs, see Am. Compl. Ex. A at 2, 4. Because the agreement does not limit the defendant's use of the CD software, it appears that the defendant has the right to indefinitely possess the CDs containing the plaintiff's original software, or even to entirely dispose of the CDs and their software if the defendant decided to do so. See Am. Compl. Ex. A. In fact, the plaintiff alleges that on September 14, 2011, the defendant requested "a full version of the CD software for the stated purpose of uploading and posting it to [the Association's] website," which the plaintiff provided to the defendant. Am. Compl. ¶ 25. The agreement does not provide the plaintiff with the right to repossess the CD software and divests the plaintiff of liability for the accuracy of the information contained on the CDs. See Am. Compl. Ex. A. And the plaintiff received significant consideration from the defendant for the CDs—$53,450.00 as a partial payment on the contract price. See id. at 4. With the exception of storing the software, all of the factors that the Second Circuit found to be indicative of ownership in Krause are present here, as well as several additional indicia of ownership, such as the plaintiff's acquiescence in providing the

software to the defendant so that it could be placed on the Association's website. These facts collectively show the "sufficient incidents of ownership" required by § 117(a).

The defendant's failure to pay the total amount due under the contract does not defeat its § 117(a) defense. While it is true that payment for the computer program is an important factor to consider in determining whether a possessor is an "owner" under § 117(a), see Krause, 402 F.3d at 124, no one factor is dispositive, see id. ("In our view, the pertinent facts in the aggregate satisfy § 117(a)'s requirement of ownership of a copy.") (emphasis added); DSC Commc'ns, 170 F.3d at 1362 ("The concept of ownership of a copy entails a variety of rights and interests.") (emphasis added). Moreover, the Court views non-payment due to an alleged breach, as in the case here, as distinguishable from non-payment due to a possessor's intent not to pay for copies of the software. As the plaintiff acknowledges, the defendant's failure to pay the remaining balance of the contract price is based solely on its assertion that the copies are defective. Pl.'s Opp'n at 6; see Am. Compl. ¶¶ 31–37. Whereas a lack of intent to pay for a computer program in general raises an inference regarding the parties' intentions as to ownership of the program, non-payment due to an alleged defect does not. The defendant's failure to pay the total contract price for the copies of the program thus bears little weight on whether the defendant is properly considered an "owner" under § 117(a).

Having found that the defendant is an "owner" within the meaning of § 117(a), the Court has no difficulty finding that the plaintiff's amended complaint establishes the remaining elements of the defense. Because the creation of a random access memory copy was necessary in order to properly run the CD on a computer, Am. Compl. ¶ 54, the creation of the copy was "an essential step in the utilization of the computer program in conjunction with a machine," § 117(a)(1). With respect to the requirement that the work be "used in no other manner" but as an "essential step in the utilization of the computer program," § 117(a)(1), courts have interpreted

the "used in no other manner" language as requiring solely personal use. See ProCD, Inc. v. Zeidenberg, 908 F. Supp. 640, 649 (W.D. Wis. 1996), rev'd on other grounds, 86 F.3d 1447 (7th Cir. 1996). The plaintiff does not allege that the defendant used the random access memory copies it created for any purpose other than utilizing the computer program itself on its own computers in order to review the CDs following their delivery. See Am. Compl. ¶¶ 54–55. The plaintiff asserts, however, that the CDs were used by the defendant in an unauthorized manner and therefore the defendant cannot show that the copies were "used in no other manner" than as an essential step in using the program, Pl.'s Opp'n at 7–8. As noted above, the agreement between the parties is utterly devoid of any restriction on the defendant's use of the CDs or CD software. See Am. Compl. Ex. A. The copies were thus "used in no other manner" than as an essential step permitting the defendant's personal use of the CDs, conduct that does not violate any term of the parties' agreement. Accordingly, the Court finds that the defendant has satisfied all of the requirements of § 117(a)(1), and therefore, the defendant's creation of random access memory copies on its computers does not constitute an infringement.

**2. Implied license**

Even if the defendant's affirmative defense under § 117(a)(1) failed, the Court finds equally persuasive the defendant's argument that the plaintiff granted it an implied license to use the CD software, which necessarily entails the creation of a random access memory copy. Def.'s Mot. at 8. Although the plaintiff states in its amended complaint that "[the defendant] has not been granted a license of any kind to use [the plaintiff's] software, nor have they received an assignment from [the plaintiff] for ownership of the software," Am. Compl. ¶ 53, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," Iqbal, 556 U.S. at 678. Thus, this Court can assess for itself whether the factual

allegations contained in the amended complaint demonstrate the existence of an implied license and need not accept the plaintiff's assertion that no such license was granted.

The existence of an implied license is an affirmative defense to a copyright infringement claim. Atkins v. Fischer, 331 F.3d 988, 992 (D.C. Cir. 2003). A nonexclusive license "arise[s] from the conduct of the parties" when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." Id. at 991–92.

The allegations in the amended complaint establish that the plaintiff granted an implied license to the defendant to use the CDs, and thus, the CD software. The parties entered into an agreement for the plaintiff to "design, produce, and deliver" 223,000 CDs for the defendant, which necessitated the plaintiff's creation of the copyrighted computer program, Am. Compl. ¶ 6, 7–8; see also id. ¶ 14 (stating that the parties "discussed the details of the software and materials to be provided on the CDs"), thus satisfying Atkins' first element. Pursuant to this contract, the plaintiff created the master CD, which included the copyrighted computer program, id. ¶¶ 15–20, and arranged for the production of the copies, id. ¶ 22. The plaintiff then arranged for the delivery of four hundred CDs directly to the defendant and the delivery of the remainder of the 223,000 CDs produced pursuant to the contract to a shipping agent designated by the defendant for distribution of the CDs to its members. Id. ¶ 26. Thus, the plaintiff made the requested work, the CDs, including the copyrighted software, and caused delivery to be made to the defendant and the defendant's designated agent, meeting the second Atkins requirement.

The final Atkins element requires the Court to look more carefully at the allegations in the amended complaint in order to accurately discern the parties' intentions. The plaintiff does not dispute that the parties contemplated the defendant's distribution of the CDs containing the

plaintiff's work. Id. ¶ 6; Pl.'s Opp'n at 10–11. However, the plaintiff argues that no implied license exists because the contract between the parties provides that "[the defendant's] only function was distribution of the CDs and that [the plaintiff] would itself provide the copies of the software in the . . . CDs and deliver them to [the defendant]." Pl's Opp'n at 10. The plaintiff then points to the amended contract's inclusion of the price for shrink-wrapping of the CDs as "clearly express[ing] [the plaintiff's] intent that [the defendant] could only thereafter deliver the CDs to its members, not make copies thereof." Id. It may be true that the plaintiff did not grant the defendant an implied license to, for example, print an additional 10,000 physical copies of the CDs and distribute them to future members of the Association, but that is not the scope of the license that the defendant urges the Court to find. Rather, the issue before the Court is whether the plaintiff granted the defendant an implied license to use the CDs itself, which results in the creation of random access memory copies. See Am. Compl. ¶¶ 54–55; Def.'s Reply at 6–7.

The parties' conduct, as derived from the allegations contained in the plaintiff's amended complaint, indicates that the parties intended that the defendant would be able to use the CDs, and thus, the copyrighted CD software. The parties' agreement contains no mention of copyrighting the CD software, and there is no allegation that the plaintiff even raised the copyright issue until after this litigation was commenced. See Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 559 n.6 (9th Cir. 1990) (considering as relevant to the existence of an implied license the fact that the licensor delivered the work without warning the licensee that copying it would constitute copyright infringement). As noted elsewhere in this opinion, the Court finds no restriction in the parties' contract on the defendant's use of the CDs. Cf. Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 516 (4th Cir. 2002) (finding the use of written contracts "providing that copyrighted materials could only be used with the creator's future involvement or express permission" relevant in determining whether the defendant had an implied license to

use architectural drawings when proceeding with project with different architect). While it is true that the purpose of the project was to create a CD that would be distributed to the Association's members, the contract language does not restrict the defendant's use of the CDs to this end. See Am. Compl. Ex. A. The plaintiff urges the Court to read the portion of the agreement providing that the defendant bore responsibility for "proofreading and approval of drafts, artwork, and CD function" before producing the copies as an express license that limited the defendant's ability to use the CDs to the development process. Pl.'s Opp'n at 10–11. This inference is simply unsupported by the language of the provision, which relates to the parties' respective responsibilities in creating the CDs, not the use of the CDs. See Am. Compl. Ex. A at 4.

The parties' actions also do not support the inference that the defendant's use of the CD software was restricted. The plaintiff provided a full copy of the CD, including the CD software, to the defendant "for the stated purpose of uploading and posting it to [the defendant's] website," an action that clearly contemplated the defendant's use of the CD software itself after the plaintiff provided the CD copies to the defendant. Am. Compl. ¶ 25. And after the CDs were printed, the plaintiff authorized a shipment of four hundred CDs directly to the defendant at the defendant's request, while the remaining CDs were shipped to a designated agent "for delivery." Id. ¶ 26. This action was clearly in anticipation of the defendant's own use of the CDs, as the shipment was sent directly to the defendant's offices and was separate from the CDs that were being shipped to the defendant's members by a designated shipping agent. The fact that the defendant paid for the CDs to be shrink-wrapped, which arguably indicates that the plaintiff did not intend for the defendant to use the CDs, is not sufficient to counter the clear import of the parties' other actions and the contract language itself. Therefore, the Court finds that the parties' agreement and conduct demonstrate that the plaintiff intended the defendant to use the CDs,

which necessarily requires the defendant to make random access memory copies of the CD software, and to distribute it.

The defendant's failure to pay the plaintiff the full contract price for the CDs does not mandate a different result, as the plaintiff argues. See Pl.'s Opp'n at 11–12 (asserting that it is internally inconsistent for the defendant to argue that it has an implied license in goods that it purports to reject, and therefore, for which it has not paid in full). This argument has been considered and rejected by other courts. See Effects Assocs., Inc., 908 F.2d at 559 n.7; I.A.E., Inc. v. Shaver, 74 F.3d 768, 778 (7th Cir. 1996). In I.A.E., Inc. v. Shaver, following the reasoning of Effects Associates, Inc. v. Cohen, the Seventh Circuit characterized the argument as "treating the complete payment of the contractual consideration as a condition precedent to the use of the copyrighted material," which was unpersuasive because the contract between the parties did not contain such a provision and "conditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language." 74 F.3d at 778 (quoting Effects Assocs., Inc., 908 F.2d at 559 n.7)). And the court found that the defendant's failure to pay the full contract price was no bar to the implied license even though it was undisputed that the failure to pay the remaining balance on the contract was a breach of the parties' agreement. Id. at 771 n.1, 778. This Court agrees with the Seventh Circuit's reasoning and finds it equally applicable here, as there is no language in the parties' agreement that conditions use of the CDs on the payment of the entire amount of the contract. In fact, the plaintiff sanctioned the defendant's use of the CD software prior to full payment of the contract price by providing it to the defendant to upload onto the Association's website. Am. Compl. ¶ 25. Thus, the Court finds that the defendant's failure to pay the remaining balance of the contract price does not bar the defendant from asserting an implied license.

The defendant has therefore satisfied all three requirements for an implied license. Accordingly, the Court finds that the plaintiff granted the defendant an implied license to use and thus necessarily copy the CD software. The Court thus finds that dismissal of the plaintiff's copyright infringement claim is warranted based both on § 117(a)(1) and because the defendant has an implied license to use the CD software in the manner challenged by the plaintiff.[6]

**B. District of Columbia claims**

The plaintiff invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1338 based on the plaintiff's federal law claim of copyright infringement, and under 28 U.S.C. § 1367 over its remaining claim of breach of contract under District of Columbia common law. Am. Compl. ¶ 3. The defendant asserts that this Court has jurisdiction over its cross-claims under District of Columbia common law and the Uniform Commercial Code because they "arise[] out of the same transaction and occurrence that is the subject matter of Plaintiff's claims." Countercl. ¶ 3. Having dismissed the sole claim upon which this Court's jurisdiction is predicated, the Court now considers whether exercise of supplemental jurisdiction over the remaining claims is proper.

Under § 1367, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a) (2006). However, § 1367(c) provides that the court "may decline to exercise supplemental jurisdiction over a claim" if, among other provisions, "the district court has dismissed all claims over which it has original jurisdiction . . . ." § 1367(c)(3). Whether to retain jurisdiction over remaining state law claims is committed to the trial court's discretion. Shekoyan v. Sibley Int'l, 409 F.3d

[6] Because the Court finds that dismissal of this claim is warranted based on either of the defendant's first two arguments, the Court need not address the defendant's argument regarding joint authorship of the software.

414, 423 (D.C. Cir. 2005). However, "[i]n the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Id. at 424 (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

The Court finds that the balance of factors here weighs in favor of declining to exercise jurisdiction over the remaining state law claims. The current litigation is at an early stage, as the plaintiff filed this case approximately a year prior to the issuance of this opinion, the parties have not yet conducted discovery, and the current and previous[7] motions to dismiss are the only matters that have occurred in this case. At this early point, dismissing the remaining claims would not waste judicial resources or require a District of Columbia court to duplicate this Court's efforts. Pursuing this litigation before a local court will not inconvenience the parties, two corporations operating in the District of Columbia, and the litigation before this Court will not prevent either party from bringing the same claims before a District of Columbia court. See 28 U.S.C. § 1367(d) (providing that the limitations period for any claims brought pursuant to § 1367(a) is tolled for thirty days after dismissal). Finally, the remaining claims involve interpretation of the parties' contract and application of District of Columbia common law and the Uniform Commercial Code, as adopted by the District of Columbia. This Court finds no reason to adjudicate claims exclusively involving the construction and application of District of Columbia law absent any particular interest favoring the exercise of its jurisdiction.

[7] The defendant previously filed a motion to dismiss based on the plaintiff's initial complaint. See generally Motion to Dismiss Statutory Copyright Infringement Count, ECF No. 5. While the motion was pending, the plaintiff amended its complaint. See Am. Compl., ECF No. 14. The Court therefore denied the initial motion to dismiss as moot.

Accordingly, the Court dismisses the plaintiff's remaining claim and the defendant's counterclaims without prejudice.

## IV. CONCLUSION

For the foregoing reasons, the Court grants the defendant's motion to dismiss, sua sponte dismisses the plaintiff's remaining claims and the defendant's counter-claims without prejudice, and denies the plaintiff's motion to dismiss as moot.

**SO ORDERED** this 2nd day of April, 2013.[8]

REGGIE B. WALTON
United States District Judge

[8] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.